**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| LAURA LAAMAN & ASSOCIATES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> LORI DAVIS, <br> Defendant. | No. 3:16-CV-00594 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

## I.      Introduction

Laura Laaman & Associates, LLC ("Laaman"), a company specializing in pet care training and consulting, brings this suit against its former employee, Lori Davis ("Davis"). Laaman claims that Davis misappropriated various marketing materials following her departure from the company and used them to start a competing business. The company sets out claims against Davis for: (i) violation of the Lanham Act, 15 U.S.C. § 1125 (Count One); (ii) violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §35-50, et seq. (Count Two); (iii) breach of contract (Count Three); (iv) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq. (Count Four); and (v) tortious interference with business relations (Count Five). Davis now moves for summary judgment on all counts, arguing among other things that the materials Laaman alleges she misappropriated were not trade secrets. (*See* ECF No. 48-1 at 1-3). For the following reasons, Davis's motion for summary judgment is hereby DENIED.

## II.      Factual Background

### a. Davis's Employment at Laaman

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated. Laura Laaman, the founder of Laaman, has provided training and consulting services to businesses in the pet care industry since at least 1995. (ECF No. 48-5, Defendant's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") ¶¶ 1-3); ECF No. 53-1, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") ¶¶ 1-3). Around twelve years ago, Ms. Laaman formed the plaintiff as "Outstanding Pet Care" ("OPC"),[1] a company that "provides sales, management, and customer service training and consulting services exclusively tailored for the pet care industry." (*See* Def.'s L.R. 56(a)1 Stmt. ¶¶ 4-5; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 4-5). Laaman offers telephone and on-line training, and "assists clients with marketing, pricing and networking. . . ." (*See* Def.'s L.R. 56(a)1 Stmt. ¶¶ 6-8; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 7-8). Laaman also provides "a program that help[s] clients track key components of their revenue." (Def.'s L.R. 56(a)1 Stmt. ¶ 8; Pl.'s L.R. 56(a)2 Stmt. ¶ 8).

Davis began working for Laaman in 2009 as an "administrative assistant or marketing assistant." (Def.'s L.R. 56(a)1 Stmt. ¶¶ 9-10; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 9-10). She was eventually promoted to client coach and then to senior client coach. (Def.'s L.R. 56(a)1 Stmt. ¶ 11; Pl.'s L.R. 56(a)2 Stmt. ¶ 11). Davis ended her employment with Laaman in September of 2012. (*See* ECF No. 1 ¶ 15; ECF No. 13 ¶ 15). Before beginning her position at OPC, Davis signed a "Confidentiality/Non Compete Agreement" ("agreement"). (*See* ECF No. 55-1, Exhibit 1). The agreement sets out the following provision governing confidential information:

> Except as required in my duties to [Laaman], or with the prior written authorization of an officer of [Laaman], during the term of my employment and thereafter, I shall not

---

[1] Since OPC and Laaman are the same entity, I refer to both as Laaman throughout this ruling for convenience.

directly, indirectly or otherwise use, disseminate, disclose, lecture upon or publish articles revealing any Confidential Information.

(ECF No. 55-1 ¶ 5).  The agreement defines "Confidential Information" as follows:

"Confidential Information" means information which is not generally known in the relevant trade or industry and confers an economic advantage to [Laaman] or a client of [Laaman] and includes trade secrets and information disclosed to me or known by me as a consequence of or through my employment by [Laaman] (including information conceived, originated, discovered by me), including information received or acquired from a client of [Laaman], whether or not in the field of employment, including information about [Laaman] products, processes and services including information relating to research, development, inventions, purchasing as well as actual and potential customer lists, customer contacts, cost and pricing information.

(*Id.* ¶¶ 2.3).  The agreement also contains a non-compete provision that prohibits working in a related industry within Connecticut for a year after termination.  (*Id.* ¶ 9).  Once the non-compete provision lapsed, Davis began her own pet care services training company, Paramount Success Group ("Paramount").  (*See* ECF No. 1 ¶¶22-23; ECF No. 13 ¶¶ 22-23).

### b.  Events Following Davis's Departure from Laaman

The parties' accounts sharply diverge following Davis's departure from Laaman.  The main issues of contention between the parties include the following.

### 1.  Davis's Computer

Laaman provided a MacBook Air computer to Davis "for use for business purposes" during her employment with the company.  (ECF No. 55-1, Declaration of Laura Laaman ("Laaman Decl.") ¶ 12); ECF. No. 55-4, Exhibit 1, Deposition of Lori Davis ("Davis Depo.") at 64-65).  Laaman permitted Davis to keep the computer at the end of her employment, subject to the condition that she delete all "company information" from the computer at that time.  (Laaman Decl. ¶ 12).  Davis stated in her deposition that she thought that she had deleted all of the Laaman associated files on the computer at the time of her departure from the company.  (Davis Depo. at 65).  Laaman's expert states in his report, however, that forensic analysis of Davis's

computer[2] revealed "several documents located on [Davis's computer] contain[ing] metadata with the company name of 'Laura Laaman & Associates.'" (ECF No. 55-3, Exhibit A, Expert Report of Sean Tuttle ("Tuttle Rep.") ¶ 10). The expert states that this indicated that "these documents were created with a version of Microsoft Office in which the company name was set to 'Laura Laaman & Associates.'" (*Id.* ¶ 15).[3] When confronted with a document that listed Laaman in its properties during her deposition, Davis testified that the "Word document or the Microsoft Office that was on the MacBook Air that [she] used to create some documents was licensed under Laura Laaman and Associates." (Davis Depo. at 164). Forensic analysis of the computer also demonstrated, in the expert's estimation, that "one of the documents located on [Davis's computer]" contains 'Laura Laaman & Associates' in both the header and footer of the document." (*Id.* ¶ 20). The expert states that this document, entitled "Master Activity Package Worksheets GRP-INDV-PUP-SC.xls," has a "create date of 2/5/2009" and that, for this specific document, "the company name was manually changed to Paramount Success Group." (*Id.* ¶¶ 21-23).

### 2. Waitlist Management Spreadsheet

Craig Laaman, who has worked at Laaman for the past decade as an information technology specialist, contends in his Declaration that a "Waitlist Management Spreadsheet" sold by Paramount is an exact copy of one that he created for Laaman. (ECF No. 55-2,

---

[2] The computer examined by Laaman's expert was not the same MacBook Air that Laaman permitted Davis to keep. Davis stated in her deposition that at some point in 2014, she gave the MacBook Air to her daughter's boyfriend so that he could sell it on eBay. (Davis Depo. at 45). Davis stated that prior to any sale, however, a "smoothie was spilled on it, and it no longer exists." (*Id.* at 50).

[3] The expert also reported that the "company name assigned to the Office installation on the Davis Computer was 'Paramount Success Group.'" (Tuttle Rep. ¶ 18).

Declaration of Craig Laaman ("C. Laaman Decl.") ¶¶ 4-7). He states that the spreadsheet in question uses "identical or nearly identical" formulas as those in the spreadsheet he created, and that "[t]here are at least 50 columns that contain identical or nearly identical titles/information (though slightly reordered or titles abbreviated differently) including at least 10 hidden columns that are exact or nearly exact copies." (*Id.* ¶ 5). Davis stated in her deposition that she created the document in question without looking to Laaman's spreadsheet, which she contends was "locked" on her computer in any event. (Davis Depo. at 178).

### 3. "Bad Words and Better Replacements"

Laaman contends that Davis copied its training product, "Bad Words and Better Replacements," which contains "25 commonly used words/phrases and suggested replacements." (Laaman Decl. ¶ 17). Paramount produced a training product entitled "PERFECT Words & Phrases for Success," which "includes 18 words/phrases and suggested replacements." (*Id.*). Eight of the words and suggested replacements on Paramount's list are identical to their counterparts on Laaman's list. (*See* ECF No. 55-1, Exhibits 3-4). Laaman avers that Paramount is the only other "entity" that "uses these combinations of words and phrases in the pet hotel industry." (Laaman Decl. ¶ 17). Davis's expert contends in her report, however, that the concepts and materials in "Bad Words and Better Replacements" were "known and being used well before [Laaman] came into existence." (*See* ECF No. 48-2, Exhibit A, Report of Susan Briggs ("Briggs Rep.") at 2).

### 4. Other Training Materials

Laaman alleges that several other products marketed by Paramount constitute copies of its materials. These purportedly copied materials include: an activity package worksheet that is allegedly "virtually identical in all respects including columns, rows, formatting, formulas, and

content" to a worksheet provided by Laaman, (Laaman Decl. ¶ 18); a "Successful Reservation Specialist Interview Process" that Laaman alleges replicates its own product "with very minor variations" (*id.* ¶ 19); a "Cat Lodging Script" that Laaman alleges "is verbatim or almost verbatim to [its] verbiage in [its] product," (*id.* ¶ 20); a "Daycare Customer Script" that Davis alleges is also a near verbatim copy of its own materials (*id.* ¶ 21); a revenue data sheet sold to a customer that purportedly strongly resembles Laaman's own product (*id.* ¶ 22); and various other materials provided by Paramount that Laaman alleges are effectively duplicates of its products (*Id.* ¶¶ 22-29). Davis's expert contends that the "concepts and materials" in Laaman's materials were well known in the industry and used well before Laaman came into existence. (*See* Briggs Rep. at 2-4).

### c. Laaman's Complaint

Laaman alleged in its complaint that Davis "presented material that is the same or substantially [similar]" to its materials in various pet care industry trade shows. (*See* ECF No. 1 ¶ 26). The company also asserted that Davis, through Paramount, used its "words, terms, or devices" without its consent, and that she misappropriated its "confidential and proprietary customer and partner information to solicit [Laaman's] customers and partners." (*Id.* ¶¶ 27-28). Finally, Laura Laaman contended in her Declaration that various products marketed by Davis's company "originated with [Laaman], [and] that [Davis] falsely claimed that she was the origin of these products. . . ." (Laaman Decl. ¶ 14). In essence, then, Laaman asserts that Davis, acting through Paramount, misappropriated its materials and held them out as her own.

## III. Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . ., and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

IV.     **Discussion**

   a. **Lanham Act (Count One)**

The Lanham Act provides, in relevant part, that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such conduct.

15 U.S.C. § 1125(a).  The gravamen of Laaman's Lanham Act claim is that Davis engaged in "reverse passing off"[4] of her products.  (*See* ECF No. 55 at 4).  "Reverse [passing] off under the Lanham Act occurs, simply stated, when 'A sells B's product under A's name.'"  *Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004), quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994) (internal quotation marks omitted).  To prevail on a reverse passing off claim, a plaintiff must establish: "(1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin."  *Softel, Inc. v. Dragon Med. & Sci. Communications*, 118 F.3d 955, 970 (2d Cir. 1997) (internal quotation marks omitted).

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), is the leading case on the origination requirement for reverse passing off claims.  *Dastar* concerned a reverse passing off claim stemming from the defendant's alleged repackaging and sale of the plaintiff's film footage.  *See Dastar*, 539 U.S. at 25-26.  The defendant had purportedly used video footage from a television series produced by the plaintiff as the foundation of its own documentary without in any way crediting the plaintiff.  *Id.* at 27.  The question before the Court was whether the defendant's action constituted "a false designation of origin" in connection with the plaintiff's "goods or services," thereby violating the Lanham Act.  *Id.* at 28-29.  In analyzing this question, the Court concluded that the phrase "origin of goods" in the Lanham Act referred to

---

[4]  Courts also refer to reverse passing off claims as "reverse palming off" claims.  *See, e.g.*, *Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004).

"the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.

Applying this definition, the Court held that the plaintiff was not the "origin" of the defendant's product because the plaintiff had not produced the tangible product at issue—i.e., the actual videos, as opposed to the content of the film they contained. *Id.* at 37-38. The Court implied that the plaintiff's claim would only have succeeded if the defendant had passed off the plaintiff's actual videotapes as its own. *See id.* at 31 ("[The plaintiff's Lanham Act claim] would undoubtedly be sustained if [the defendant] had bought some of [the plaintiff's] videotapes and merely repackaged them as its own."). After *Dastar*, courts have uniformly held that a reverse passing off claim cannot encompass "misrepresentations about the author of an idea, concept, or communication embodied" in a plaintiff's goods but rather only misrepresentations about the origins of the goods themselves. *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 713 F. Supp. 215, 234 (S.D.N.Y. 2010); *General Universal Systems, Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (rejecting plaintiff's reverse palming off claim on basis that it had not accused defendant of selling plaintiff's products but rather of copying plaintiff's ideas).

The question of where to draw the line between protected goods and unprotected ideas, however, has divided courts in the aftermath of *Dastar*. *Compare Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 935-936 (E.D. Va. 2010) (holding that defendant's repackaging and sale of information stripped from plaintiff's computer database provided basis for cognizable reverse passing off claim); *Experian Marketing Solutions, Inc. v. U.S. Data Corp.*, No. 8:09CV24, 2009 WL 2902957, at *10 (D. Neb. Sept. 9, 2009) (holding that defendant's unauthorized acquisition of and sale of plaintiff's consumer data files gave rise to viable reverse passing off claim) *with Smartix Intern. Corp. v. MasterCard Intern. LLC*, No. 06 CV 5174 (GBD), 2008 WL 4444554,

at *6-7 (S.D.N.Y. Sept. 30, 2008) (dismissing reverse passing off claim alleging defendant had stolen and reproduced plaintiff's software); *Bob Creeden & Associates, LTD. v. Infosoft, Inc.*, 326 F. Supp. 2d 876, 879-80 (N.D. Ill. 2004) (dismissing reverse passing off claim based on defendant's purported theft and distribution of plaintiff's software to its competitors). The Second Circuit has yet to weigh in on the issue.

Even if *Dastar* precluded any claim based on theft and reproduction of proprietary information, however, summary judgment for Davis would not be warranted. Davis contends that Laaman's claim fails because it alleges only that she misappropriated the company's ideas rather than its materials. (*See* ECF No. 56 at 2-4). This argument mischaracterizes Laaman's claims. Laaman is not merely alleging that Davis copied her ideas—the company contends that Davis illicitly maintained its materials on her computer—the actual documents—and sold them as her own. (*See* ECF No. 55 at 5-11; ECF No. 1 ¶ 31-36). In other words, the company alleges that it, not Davis, is the actual "origin" of the documents at issue. For example, in her declaration, Ms. Laaman avers that she received materials from one of Davis's clients and that a review of these materials showed that "[Davis] had retained copies of [Laaman's] products and materials and was reselling them as her own." (Laaman Decl. ¶ 14).

Laaman's allegations in this vein are not without supporting evidence. Its expert concluded that hundreds of documents located on Davis's computer contained metadata suggesting they were created by Laaman or at least a Laaman-associated computer; he also opined that the computer included multiple versions of the same spreadsheet, only one of which set forth the name "Laaman" in both the header and footer of the document. (*See* Tuttle Rep. ¶¶ 10, 20, 23). He further opined that this document was originally created in 2009, while Davis was working for Laaman. (*Id.* ¶ 22). While Davis provided an explanation for this phenomenon

in her deposition, the parties' dueling contentions present a genuine issue of material fact that cannot be resolved in this posture. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. "). Admittedly, Laaman's materials do not provide any further specification as to which particular documents—other than the spreadsheet created in 2009—contained the Laaman identifier. Drawing all "justifiable inferences" in Laaman's favor, *see id.*, 477 U.S. at 255, however, I find that the evidence supports the conclusion that each of the allegedly misappropriated materials mentioned in Laaman's accusations could have originated with Laaman. Thus, Laaman's reverse passing off claim satisfies the origination requirement. It also satisfies the false designation requirement, as the above analysis demonstrates a genuine issue of material fact concerning whether Davis sold the materials as her own products.

To determine whether a likelihood of confusion exists due to an alleged false designation of origin, a court must apply an eight-factor balancing test concerning:

> "(1) [T]the strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may bridge the gap by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market."

*International Information Systems Sec. Certification Consortium, Inc. v. Security University, LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (internal quotation marks omitted). The application of this standard is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.*, quoting *Star Indus v. Bacardi & Co., Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005). Here, the majority of the factors are

irrelevant due to the nature of the allegations. *See Suntree Technologies, Inc. v. EcoSense Intern., Inc.*, 802 F. Supp. 2d 1273, 1284 (M.D. Fla. 2011) (noting that various factors adjudicating the similarity of the parties' respective marks are irrelevant in reverse passing off cases).

As a general matter, however, courts have concluded that a party's attempt to pass off another party's product as its own satisfies the confusion requirement of the Lanham Act for an obvious reason—it represents a direct attempt to confuse a consumer about the origin of a product. *See Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438-39 (4th Cir. 2010) ("When a 'defendant has taken the plaintiff's product and has represented it to be his own work,' it is 'difficult to imagine how a designation of origin of a product . . . could be more likely to cause confusion or mistake as to the actual origin of the product.'") (quoting *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998)); *Mid-List Press v. Nora*, 374 F.3d 690, 693 (8th Cir. 2004) ("It is difficult to imagine how the public would not be confused about the origin of [the defendant's product], when the [product] actually bore the [plaintiff's] trade name and ISBN number."); *Target Advertising, Inc. v. Miller*, No. 01 CIV. 7614(AGS), 2002 WL 999280, at *7 (S.D.N.Y. May 15, 2002) (concluding that defendant passing off plaintiff's goods as its own created likelihood of confusion). The same principle applies here. Thus, Laaman's reverse passing off claim meets the consumer confusion requirement.

Finally, there is a genuine issue of material fact concerning whether Laaman has been harmed due to Davis's actions. Courts have generally required only minimal showings of harm by a party whose goods are passed off and sold by another. *See Pop Bar, LLC v. Fellows*, No. 12 CIV. 06647 TPG, 2013 WL 4446227, at *6 (S.D.N.Y. Aug. 19, 2013) (plaintiff alleging reverse passing off claim alleged valid harm due to negative effects to its "goodwill and reputation");

*Carell v. Shubert Organization, Inc.*, 104 F. Supp. 2d 236, 259 (S.D.N.Y. 2000) ("The harm caused by reverse passing off is that the originator of the product is 'involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.'") (quoting *Rosenfeld v. W.B. Saunders, Division of Harcourt Brace Jovanovich, Inc.*, 728 F. Supp. 236, 241 (S.D.N.Y. 1990)); *Universal Furniture Intern., Inc.*, 618 F.3d at 439 (same). Even if this intrinsic injury of reverse passing off did not satisfy the harm requirement, Laaman provided evidence that a number of its customers had ceased doing business with it shortly after Davis started her company. (*See* Pl.'s L.R. 56(a)2 Stmt. ¶¶ 20-32). Thus, drawing all inferences in Laaman's favor, a trier of fact could conclude that these customers left Laaman due to Davis's passing off of its products. Laaman's Lanham Act claim therefore satisfies the harm requirement as well.[5]

For these reasons, Davis's motion for summary judgment with respect to Davis's Lanham Act claim must be denied.[6]

### b. CUTSA (Count Two)

CUTSA "prohibits misappropriation of trade secrets." *Tourmaline Partners, LLC v. Monaco*, No. 3:13-CV-00108 (VAB), 2016 WL 614361, at *2 (D. Conn. Feb. 16, 2016).

---

[5] The Second Circuit's opinion in *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994), does not alter this conclusion. In *Ortho*, as Davis notes (*see* ECF No. 56 at 4-5), the Second Circuit stated that "[t]he likelihood of injury and causation will not be presumed" and that the court had "tended to require a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products. . . ." *Id.* at 694 (internal quotation marks and citations omitted). One strains to see how Laaman's products would not be in competition with those of Davis, however, given Laaman's allegations that Davis has been *marketing Laaman's products*.

[6] Given my conclusion, I omit analysis of Laaman's secondary argument that Davis violated the Lanham Act by infringing upon its trademarks. *See* ECF No. 55 at 12-13).

Misappropriation is defined in relevant part as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. . . ." Conn. Gen. Stat. § 35–51(b). The Connecticut Supreme Court has concluded that former employees with knowledge of the trade secrets of their employers fall within the ambit of CUTSA. *See, e.g.*, *Elm City Cheese Co., Inc. v. Federico*, 251 Conn. 59, 69 (1999) ("Even after the employment has ceased, however, the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.") (internal quotation marks omitted).

CUTSA defines "trade secrets" as:

information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35–51(d). While a trade secret need not be known solely by the proprietor to merit protection, "a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means." *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525, 538 (1988). For example, a customer list can be a trade secret if an employee "acquired it in confidence from his employer" but would not be protected "if the customers' names can readily be ascertained through ordinary business channels or reference resources." *Id.*

Relevant factors in determining whether information is a trade secret include:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Town & Country House & Homes Service, Inc.*, 150 Conn. 314, 319 (1963).  Due to the holistic nature of this analysis, the question of whether "a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry."  *See Elm City Cheese Co., Inc. v. Federico*, 251 Conn. 59, 80 (1999).  A "reasonable effort" in one case may not be adequate in another.  *Id.*  As a result, "[t]he question of whether information sought to be protected by the trade secrets act rises to the level of a trade secret is 'one of fact. . . .'"  *Id.* at 68, quoting *Allen Mfg. Co.*, 145 Conn. at 516.

Laaman claims that Davis misappropriated its trade secrets in violation of CUTSA, including its customer lists and its "proprietary training programs, business strategies, and other critical business information that would be invaluable – and unavailable – to [a] competitor." (ECF No. 1 ¶¶ 18-20).  Davis trains all of her fire on the secrecy issue, contending that none of this purportedly proprietary information constituted "trade secrets" protected by CUTSA due to Laaman's failure to make a reasonable effort to protect it.  (*See* ECF No. 48 at 13-18).  For example, Davis contends that Laaman's customer lists cannot be trade secrets because they are easily ascertainable via regular means, e.g., Laaman lists certain customers on its website.  (*See* ECF No. 48-1 at 16-18; ECF No. 48-3 at Exhibit B).  Davis also argues that many of Laaman's customers could be identified by searching a telephone directory or a "Google search," and that she remembered many of the customers from her time at Laaman.  (*See* ECF No. 48-1 at 17).  In support of this argument, Davis relies heavily upon the Connecticut Supreme Court's decision in *Weiss*.  (*Id.*).  In that case, the Connecticut Supreme Court upheld a trial court's determination

that a company's customer lists were not "trade secrets" in part because of evidence that the lists "could be obtained independently simply by using telephone directories or making personal contact." *Weiss*, 208 Conn. at 539.

There are three major flaws in Davis's argument. First, *Weiss* concerned a review of a trial court's factual determination regarding whether the customer lists at issue constituted trade secrets—as such, the court determined only that the trial court "was not clearly erroneous" in its conclusion. *Id.* Such a determination is not analogous to the question at hand here, which concerns whether the customer lists constitute trade secrets in the first instance. Second, the fact that the identity of certain customers can be attained using public sources does not prevent the entire list from being a trade secret. A "trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources." *United States v. Nosal*, 844 F.3d 1024, 1042-43 (9th Cir. 2016); *see also Milso Indus. Corp. v. Nazzaro*, No. 3:08CV1026 AWT, 2012 WL 3778978, at *8 (D. Conn. Aug. 30, 2012) ("Although customer lists are on the periphery of the law of trade secrets, courts have frequently held that customer lists and pricing information are deserving of trade secret protection.") (internal quotation marks and citations omitted). Third, the contention that Laaman was laissez-faire with its proprietary information is belied by the fact that it required Davis to sign a confidentiality agreement prior to the start of her employment. (*See* ECF No. 55-1, Exhibit 1); *Milso Indus. Corp.*, 2012 WL 3778978 at *9 ("Reasonable efforts to maintain secrecy include requiring employees to sign confidentiality agreements. . . .") (internal quotation marks omitted).

Davis stands on even weaker ground in contending that Laaman's various other asserted proprietary materials are not trade secrets. She contends that the information at hand was attainable by "proper means" through contact with clients, that she remembered much of the

information due to her work with the company, and that, in any event, Laaman did not prevent its clients from sharing these materials with others in the industry. (*See* ECF No. 48-1 at 18-21). As noted above, however, Laaman required Davis to sign a confidentiality agreement; hence, Davis' memory of the materials does not exculpate her. Also, more fundamentally, Laaman charged its clients for the materials at issue. (*See* Laaman Decl. ¶ 7). Clients' willingness to pay significant sums for the materials suggests that they were not publicly available. Finally, even if some of the information at issue was attainable through public means, it would not prevent the materials from being trade secrets. *See Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460, 479 (D. Md. 1999) (concluding that while the information at issue did "contain some public information and facts ascertainable from the marketplace," it could still be a trade secret because it "likewise include[d] personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information"); *Nosal*, 843 F. 3d at 1042-43.

For these reasons, Davis is not entitled to summary judgment on Davis's CUTSA claim.

**c. Breach of Contract (Count Three)**

To prove a breach of contract claim under Connecticut law, a plaintiff must establish: "(1) the existence of a contract or agreement; (2) the defendant's breach of the contract or agreement; and (3) damages resulting from the breach." *Chem-Tek, Inc. v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993) (citing *O'Hara v. State*, 218 Conn. 628 (1991)). Here, Laaman alleges that Davis breached her confidentiality agreement with the company by divulging its materials to clients and at conferences where she presented. (*See* ECF No. 1 ¶¶ 48-52). In asserting her claim for summary judgment, Davis avers that she did not breach the confidentiality agreement because none of the materials allegedly divulged constitutes "a mark

or a trade secret." (*See* ECF No. 48-1 at 22). My conclusion in the previous section that there is

at least a triable issue about whether the materials at issue constitute trade secrets under CUTSA

forecloses this argument. Beyond this, the definition of "confidential information" in the

agreement is more extensive than the definition of "trade secrets" under CUTSA. The agreement

extends to any information "not generally known" in the industry, any information "received or

acquired" from a client of [Laaman] "whether or not in the field of employment," and to

information "relating to research, development, inventions, purchasing as well as actual and

potential customer lists, customer contacts, cost and pricing information." (ECF No. 55-1 at

Exhibit 1). This expansive language easily generates a genuine issue of material fact concerning

whether Davis breached the agreement.

For these reasons, Davis is not entitled to summary judgment on Laaman's breach of

contract claim.

### d. CUTPA (Count Four)

CUTPA provides that "[n]o person shall engage in unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat.

§ 42-110b(a). In determining whether a practice violates CUTPA, a court must consider three

criteria:

> (1) [W]hether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common law, or
> otherwise—in other words, it is within at least the penumbra of some common law,
> statutory, or other established concept of unfairness; (2) whether it is immoral, unethical,
> oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers,
> [competitors or other businesspersons]. . .

*Ulbrich v. Groth*, 310 Conn. 375, 409 (2013), quoting *Harris v. Bradley Memorial Hospital &*

*Health Center, Inc.*, 296 Conn. 315, 350-51 (2010). A practice may violate CUTPA without

meeting all three criteria—i.e. a practice "may be unfair because of the degree to which it meets

one of the criteria or because to a lesser extent it meets all three. . . ." *Id.* "Whether a practice is unfair and thus violates CUTPA is an issue of fact." *Milso Industries Corp.*, 2012 WL 3778978 at *14, quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 434 (2004).

Davis contends that her conduct could not have violated CUTPA because her actions were not deceptive, did not harm Laaman, and did not disclose proprietary information. (*See* ECF No. 48-1 at 23-25). As noted in previous sections, however, all of those contentions present genuine issues of material fact. *Compare Milso*, 2012 WL 3778978 at *15 (denying summary judgment on CUTPA claim based in part on misappropriation of customer lists due to "genuine issues of material fact" concerning whether plaintiff's "customer list and 'business plan" were comprised of publicly available information).

Thus, Davis is not entitled to summary judgment on Laaman's CUTPA claim.

**e.    Tortious Interference With Business Relations (Count Five)**

A party setting out a tortious interference with business relations claim must establish the following elements: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Robert S. Weiss and Associates, Inc.*, 208 Conn. at 222-223, quoting *Blake v. Levy*, 191 Conn. 257, 260-61 (1983). Thus, "a claim is made out [only] when interference resulting in injury to another is wrongful by

some measure beyond the fact of the interference itself." *Blake*, 191 Conn. at 262, quoting *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978). Here, Laaman claims that Davis interfered with its business relations with its clients through her tortious conduct, thereby depriving it of those relationships. (*See* ECF No. 1 at 59-63).

Davis contends that she is entitled to summary judgment on the claim for two reasons: (1) Laaman does not clearly plead that the alleged misappropriation of its confidential information tortiously interfered with its business relations; and (2) Laura Laaman stated in her deposition that the tortious interference claim was based merely on her opinion rather than admissible evidence. (*See* ECF No. 48-1 at 28-29). Neither of these claims has merit. As noted above, Laaman has presented sufficient evidence to generate a genuine issue of material fact concerning whether Davis misappropriated its confidential information. Misappropriation of confidential information is, in turn, a tort. *See Smith v. Snyder*, 267 Conn. 456, 462 (2004) (mentioning "common-law theory of misappropriation of trade secrets, which is codified in CUTSA"); *Evans v. General Motors Corp.*, 277 Conn. 496, 508 (2006) (approving party's contention that CUTSA "is rooted in the common law"). Laaman alleged in her complaint that this tortious conduct resulted in her losing various customers to Paramount. (*See* ECF No. 1 ¶ 61). Such allegations therefore plead a viable claim for interference with business relations. *See Milso Industries Corp.*, 2012 WL 3778978 at *14 (denying summary judgment on interference with business relationships claim where plaintiff "produced evidence that create[d] genuine issues of material fact . . . as to whether the defendants used improper means by misappropriating the plaintiff's trade secrets to solicit [its] customers. . .").

Davis's citations to Laura Laaman's deposition testimony are also unavailing. Davis contends that Laura Laaman conceded in her deposition testimony that the tortious interference

with business relations claim was merely based on her opinion. (*See* ECF No. 48-1 at 29). In the testimony at issue, Ms. Laaman states as follows in response to a question concerning what evidence she had suggesting Davis had interfered with her company's business relations: "The fact that [Davis] had access to our client base, that she had relationships with them, and that they were paying us for many years, in most cases, and they left and they started with her." (*See* ECF No. 48-6, Deposition of Laura Laaman ("Laaman Depo.") at 108). When asked if she could think of any other evidence, Ms. Laaman responded that she could not think of any "at this moment." (*Id.*). Given the other evidence evinced in the parties' materials, this lone answer does not dispel any genuine issue of material fact concerning whether Davis tortiously interfered with Laaman's business relationships. Also, the parties' Local Rule 56(a) statements heavily dispute the nature of Ms. Laaman's testimony on the matter, [7] the timing of the departure of various clients from Laaman, and the reasons for their departure. (*Compare* Pl.'s L.R. 56(a)2 Stmt. ¶¶ 14-32 *with* Def.'s L.R. 56(a)1 Stmt. ¶¶ 14-32).

As such, there is a genuine issue of material fact that precludes Davis from attaining judgment as a matter of law on Laaman's tortious interference with business relations claim.

## V.     Conclusion

For the foregoing reasons, Davis's motion for summary judgment (ECF No. 48) is DENIED.

IT IS SO ORDERED.

    /s/                      
Michael P. Shea, U.S.D.J.

---

[7] Laaman argues that Davis's contention mischaracterizes her testimony. The company notes in its Local Rule 56(a)(2) statement that Ms. Laaman also stated in her deposition that "it was her opinion that evidence of the tortious interference would be in [Davis's] possession" or on her computer. (*See* Def.'s L.R. 56(a)1 Stmt., Laaman Depo. at 108).

Dated:        Hartford, Connecticut
                November 27, 2017